## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

IN RE:  ALICE WALLACE,                                    Case No. 4:15-bk-12289 J
                                                          (Chapter 7)
            Debtor.


ALICE WALLACE                                                          PLAINTIFF


VS.                              AP No. 4:15-ap-1078


NELNET, INC. AND
UNITED STATES DEPARTMENT OF EDUCATION                      DEFENDANTS


### MEMORANDUM OPINION

Before the Court is the *Second Amended Complaint to Determine Dischargeability of Debt* (the "**Complaint**") filed by the Debtor, Alice Wallace ("**Ms. Wallace**" or the "**Debtor**") on September 17, 2015 (Doc. No. 6), and the *Answer* to the Complaint (the "**Answer**") filed by the Defendant, the United States Department of Education (the "**USDE**") on October 19, 2015 (Doc. No. 13).[1]  A trial on the merits was held on January 26, 2016, in Little Rock, Arkansas.  Ms. Wallace appeared in person and also by and through her attorney, Steven R. Davis.  The USDE appeared by the through the United States Attorney by and though his Assistant U.S. Attorney, Stacey E. McCord.  At the conclusion of the trial, the Court took the matter under advisement. For the reasons stated herein, the relief sought in the Complaint is granted.  The debt owed by Ms. Wallace to the USDE is determined to be an undue hardship on Ms. Wallace and should be discharged.

---

[1] The Complaint as to Nelnet, Inc., was dismissed by order entered October 22, 2015.  (Doc. No. 15).

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

Ms. Wallace filed a voluntary petition for relief under the provisions of Chapter 7 of the United States Bankruptcy Code on May 12, 2015.  An order granting Ms. Wallace a discharge from her dischargeable debts was entered by the Court on August 20, 2015.

In her Complaint, Ms. Wallace seeks to discharge $43,253.63 of student loan debt. (Second Am. Compl. ¶ 5, Doc. No. 6).  She alleges it would be an undue hardship on her if the student loan debt was not discharged because she lacks resources to pay the debt.  (Second Am. Compl. ¶¶ 6-7, Doc. No. 6).  Ms. Wallace further alleges that she will not be able to pay the student loan debt in the future because of her age, health, and poor employment prospects. (Second Am. Compl. ¶ 8, Doc. No. 6).

In its Answer, the USDE claims the amount owed by the Debtor is $43,474.26[2] as of September 3, 2015.  (Answer ¶ 5, Doc. No. 13).  It raises as a defense to the Complaint that Ms. Wallace "has not taken advantage of income based repayment options offered by the Department of Education."  (Answer, Defense ¶ 1, Doc. No. 13).

At the trial, Ms. Wallace argued that her student loan debt should be discharged because of her age, her low income, and her dismal employment prospects.  Ms. Wallace also argued that

---

[2] At trial, the USDE introduced an exhibit reflecting the total amount owed by the Debtor to the USDE to be $45,203.62 as of September 3, 2015.

even though she lives a very frugal lifestyle, there are no funds left to pay the student loan debt after she pays her monthly expenses.

The USDE argued that despite the fact that Ms. Wallace was currently unemployed, Ms. Wallace had previously been employed from 2010 to 2013, was employed from June 2014 to October 2015, and Ms. Wallace was actively seeking employment again. It further argued Ms. Wallace has no dependents and because of the discharge in bankruptcy, she has very few expenses other than her student loan expense. Finally, the USDE argued that Ms. Wallace would qualify for an income based or income contingent repayment plan offered by the USDE. The USDE further argued that under Ms. Wallace's "circumstances right now, her payment would be zero [a]nd after 25 years, if the debt was not repaid, the debt would be forgiven." (Tr. at 7).

## FACTS

At the time of trial, Ms. Wallace was sixty-three years old. She is a cancer survivor and continues to take prescribed medication because of her cancer diagnosis. Ms. Wallace is scheduled to see her doctor every three months for follow-up appointments, but she has not been keeping the appointment schedule because she does not have health insurance and she lacks funds to pay for the doctor visits.

She lives at 1201 Parker Street in North Little Rock, Arkansas and has lived there since June 1992. She has no dependents. She owns her home and paid off her mortgage in July 2015. The home is in need of repairs including repairs to the foundation that have been estimated at $2,000.00. Ms. Wallace owns and drives a 2000 Oldsmobile Alero with approximately 110,000 miles. She uses her vehicle to drive to job interviews, to pay bills, and to church. Ms. Wallace testified that the Alero is in need of some repairs but she cannot afford to make any repairs on it at the present time.

3

Ms. Wallace lives a frugal lifestyle. For example, when working, she takes her lunch to work instead of eating out, does not eat out at restaurants, and does not go to the movies. She testified she has not bought herself any clothes in over a year and a half adding she "can't afford clothes." (Tr. at 20). She has not bought any major appliances in over ten years. She has not taken a recent vacation, and the last time she left the State of Arkansas was in 2011 for family business.

*The Loans.* The first student loan at issue was obtained by Ms. Wallace in 2005. On May 18, 2005, Ms. Wallace signed a Federal Direct Consolidation Loan Application and Promissory Note (the "**2005 Promissory Note**"), consolidating two prior loans.[3] (Def.'s Ex. 3). One disbursement was made on the 2005 Promissory Note on June 24, 2005, in the amount of $3,598.38. (Def.'s Ex. 4). Ms. Wallace chose to repay the 2005 Promissory Note under the income contingent repayment plan (the "**ICRP**"), consenting to disclosure of tax information as part of the repayment plan. (Def.'s Ex. 3). Although the Certificate of Indebtedness for the 2005 Promissory Note states that no payments have been made on the loan, Ms. Wallace testified that she did make payments on this loan under the ICRP in monthly installments of approximately $50.00. (Def.'s Ex. 4). The amount due on the 2005 Promissory Note as of September 3, 2015, was $1,699.42, which included principal of $1,579.08 and interest of $120.34. (Def.'s Ex. 4). The Court notes that Ms. Wallace's testimony regarding payments made on this loan is consistent with the current balance of the loan being significantly less that the disbursement amount and finds her testimony credible.

The next student loans at issue were obtained by Ms. Wallace between 2010 and 2014. Ms. Wallace testified that she went back to school in January 2010 enrolling in classes at Pulaski

---

[3] It appears from the documents introduced as Defendant's Exhibit 3 that the two prior loans were obtained by the Debtor in 1986. (Def.'s Ex. 3 at 4).

Technical College to earn an associate degree.  From her testimony at trial she would have been fifty-seven years old at the time.  She went to school for four years and earned two business related associate degrees: one in accounting and one in office technology.  She earned her first associate degree in 2012 and the second associate degree in 2014.  She was unable to obtain Pell Grants and could not have gone back to school to earn the two associate degrees without student loan assistance.

On September 11, 2010, Ms. Wallace signed a Master Promissory Note with the William D. Ford Federal Direct Loan Program (the "**2010 Master Promissory Note**").  (Def.'s Ex. 1). The 2010 Master Promissory Note provided that "more than one loan may be made to [the Debtor] under this [Master Promissory Note]."  (Def.'s Ex. 1 ¶ 16).  Between September 2010 and January 2014, twelve loans were disbursed pursuant to the terms of the 2010 Master Promissory Note in the total amount of $38,499.00.  (Def.'s Ex. 2).  Each loan varied in the amount of principal and applicable rate of interest.  (Def's. Ex. 2).

Ms. Wallace testified that she did not recall whether she had chosen a repayment plan for the twelve loans disbursed under the 2010 Master Promissory Note, but admitted that information regarding various repayment plans was contained in documents mailed to her correct mailing address.  The 2010 Master Promissory Note provided that if a repayment plan is not chosen by the borrower, the borrower will be placed on the standard repayment plan.  (Def.'s Ex. 1 at 6).  Ms. Wallace testified that she believed she was under the standard repayment plan for the twelve loans.  Her testimony was corroborated by two letters sent to Ms. Wallace indicating that she was under the standard repayment plan.  (Def.'s Exs. 6, 7).  Under the standard repayment plan, the borrower makes fixed monthly payments to repay the loan in full within ten years.  (Def.'s Ex. 1 at 6).

Ms. Wallace testified that she did not make any payments on the twelve loans,[4] nor did she request to be placed on the income based repayment plan or ICRP.  Instead, she requested a forbearance on making payments on the twelve loans because she could not afford to make any payments at the time the payments were due.  The 2010 Master Promissory Note explains that a forbearance "allows [the borrower] to temporarily stop making payments on [the] loan, temporarily make smaller payments, or extend the time for making payments."  (Def.'s Ex. 1 at 6).  Ms. Wallace testified that she requested a forbearance, and her request was granted.  She testified that "they gave [her] more time."  (Tr. at 48).

The USDE's records indicate that the total amount of principal and interest due on the twelve loans disbursed under the 2010 Master Promissory Note was $43,504.20 as of September 3, 2015.  (Def.'s Ex. 2).

In total, the evidence revealed that the outstanding debt owed by the Debtor to the USDE on all thirteen loans as of September 3, 2015 was $45,203.62, which breaks down into current principal and interest as follows:

|    | Principal  | Interest | Interest Rate                        |
|----|------------|----------|--------------------------------------|
| 1  | $1,579.08  | $120.34  | 4.25% (2005 Promissory Note)         |
| 2  | $3,499.99  | $127.59  | 4.50% (2010 Master Promissory Note)  |
| 3  | $4,388.13  | $241.81  | 6.80% (2010 Master Promissory Note)  |
| 4  | $4,500.00  | $123.99  | 3.40% (2010 Master Promissory Note)  |
| 5  | $7,217.01  | $397.71  | 6.80% (2010 Master Promissory Note)  |
| 6  | $2,288.74  | $ 63.06  | 3.40% (2010 Master Promissory Note)  |
| 7  | $3,440.67  | $189.60  | 6.80% (2010 Master Promissory Note)  |
| 8  | $2,288.74  | $ 63.06  | 3.40% (2010 Master Promissory Note)  |
| 9  | $3,350.75  | $184.65  | 6.80% (2010 Master Promissory Note)  |
| 10 | $2,293.98  | $ 71.76  | 3.86% (2010 Master Promissory Note)  |
| 11 | $3,130.30  | $ 97.92  | 3.86% (2010 Master Promissory Note)  |
| 12 | $2,293.98  | $ 71.76  | 3.86% (2010 Master Promissory Note)  |
| 13 | $3,083.54  | $ 96.45  | 3.86% (2010 Master Promissory Note)  |

---

[4] A Certificate of Indebtedness introduced by the USDE reflected that $88.00 in payments have been made by the borrower on the loans.  (Def.'s Ex. 2).

(Def.'s Exs. 2, 4).  The 2005 Promissory Note and 2010 Master Promissory Note also reflect that the loans made pursuant to those notes were made by a governmental unit for educational purposes.  (Def.'s Exs. 1, 3).

No testimony was introduced regarding the amount of the monthly payments for the twelve loans.  However, in order to pay the $43,504.20 balance on the twelve loans in 120 fixed monthly payments, as required by the standard repayment plan, Ms. Wallace's monthly payment would be $362.54 in principal alone, not including interest that would continue to accrue on the loans during the repayment period.  In addition, as stated above, Ms. Wallace was making payments on the 2005 Promissory Note of $50.00 per month under the ICRP.

***Employment and Salary History.***  As of the date of the trial, Ms. Wallace had been unemployed for almost four months and was receiving unemployment benefits from the State of Arkansas.  The testimony included a discussion of various jobs Ms. Wallace has had in the past several years.  The first employment position discussed at trial was with the Arkansas Municipal League, where she was employed from approximately 2006 to 2008 when she lost the job because the company downsized.

There was no testimony regarding Ms. Wallace's employment from 2008 to May 2010.  The next employment position discussed at trial was with the Department of Housing and Urban Development where Ms. Wallace was employed from May 2010 until October 2012.  Ms. Wallace then worked from October 2012 until February 2013 as an Access Coordinator for the University of Arkansas for Medical Sciences.

There was no testimony regarding Ms. Wallace's employment from February 2013 until June 2014.  However, the testimony revealed that Ms. Wallace was diagnosed with cancer in

August 2013 and underwent surgery that same month.  Again, she was still taking cancer medication and was still under a doctor's care for her cancer illness at the time of the trial.

In June 2014 Ms. Wallace started working at the Arkansas Department of Health as an Administrative Specialist 2, which she described as a data entry position.  She worked with the Arkansas Department of Health until September 2015.  She then took a position with the Arkansas Department of Finance and Administration, but worked only four days before being terminated for not being a "good fit" for the position in early October 2015.  (Tr. at 10).  She began drawing unemployment benefits in October 2015.

The highest salary Ms. Wallace has earned since 2006 was $25,400.00 per year when she was working at the Arkansas Municipal League.  She lost that job in 2008.  Ms. Wallace's 2014 federal income tax return was introduced into evidence and reflected gross income of $10,836.00.  (Pl.'s Ex. 3).  In the several months before the bankruptcy petition was filed, while working with the Arkansas Department of Health, she earned $10.5987 per hour, which annualizes to gross income of $22,045.30.  (Pl.'s Ex. 1).  The testimony revealed, however, that Ms. Wallace never worked at this job for a full tax year, but worked there for only part of 2014 and part of 2015.  Her 2015 average net income from this position was $1,239.30 every four weeks.[5]  (Pl.'s Ex. 1).  Her last job prior to the hearing was with the Department of Finance and Administration, which only lasted four days before she was terminated in early October 2015. There was no evidence as to her rate of pay at this position.  The current annual poverty guideline amount for a household of one is $11,770.00 or $980.83 per month.  (Def.'s Ex. 11).

Ms. Wallace introduced copies of a notebook in which she has documented jobs she has applied for over the past several years.  Between 2011 and 2015, Ms. Wallace applied for dozens

---

[5] Calculated from the remuneration statements for pay periods January 18, 2015 through September 26, 2015.  (Pl.'s Ex. 1).  This average includes a Merit Lump Sum Payment in the gross amount of $440.96 paid in June 2015.

of jobs each year, usually online or via email.  The notebook reflects that Ms. Wallace applied for these various positions both while she was employed and also during periods for which there was no testimony regarding her employment.  She applied for positions that appear to fit under a general business umbrella as well as positions outside her area of study.

The notebook reflects that from January 2011 through October 2012, while Ms. Wallace was working with the Department of Housing and Urban Development, Ms. Wallace was called for nine interviews including an interview with UAMS in September 2012.  Ms. Wallace then worked at UAMS from October 2012 through February 2013, during which time she was called for four interviews from her various job applications.  No testimony was given regarding Ms. Wallace's employment between February 2013 and June 2014, but her notebook reflects that she was called for thirteen interviews during this time period.  Between June 2014 and September 2015, when Ms. Wallace was working for the Arkansas Department of Health, she was called for four interviews.  She then worked for four days with the Arkansas Department of Finance and Administration before being terminated in early October 2015.

From the time she was terminated from the Department of Finance and Administration in October 2015 through the date of trial in January 2016, Ms. Wallace submitted twenty-three job applications for the following positions:

> Fiscal Support Specialist – Arkansas Rehabilitation Services
> Insurance Licensing Technician – Arkansas Insurance Department (2 positions)
> Administrative Analyst – Arkansas Teacher Retirement System
> Customer Service – Circulation Department – Arkansas Democrat Gazette
> Billing Specialist and Financial Services Coordinator – CARTI
> Medical Billing Service
> Student Account Representative – Shorter College
> Office Administrative Assistant
> Medical Billing – MedPractice
> Fiscal Support Specialist – Department Workforce Services
> Administrative Assistant – Department Workforce Services
> Administrative Specialist III – Arkansas State Medical Board

Administrative Specialist III – Arkansas Department of Health
Human Resources Specialist – Department of Finance and Administration
Health Services Specialist II – Arkansas Department of Health
Purchasing Specialist – Arkansas Department of Health
Administrative Specialist III – Arkansas Military Department
Healthcare Analyst – Department of Human Services – Division of Medical Services
Administrative Specialist II – Arkansas Department of Community Corrections
Administrative Specialist III – Arkansas Department of Health
Human Resources Assistant – Department of Human Services
Fiscal Support Specialist – Arkansas Board of Parole

(Pl.'s Ex. 4).

Despite being called for multiple interviews in the past, Ms. Wallace testified that as a result of submitting these twenty-three applications, she was called for only one interview. The interview was with the Arkansas Insurance Department, but she was not offered the position following the interview. Notwithstanding her poor track record in obtaining and maintaining employment, Ms. Wallace testified she is "hopeful" that she will be able to find employment. (Tr. at 18). Her desire is to obtain a job with the State of Arkansas in order to become fully vested in her pension plan and increase the amount of her retirement income. She testified she is "not quite there" on the length of time it takes to become vested. (Tr. at 26).

The Court notes that Ms. Wallace is seeking employment not only with the State of Arkansas, but with other employers as well. She also continues to seek both full-time and part-time employment. She testified that she thought both her age and the fact that she had been terminated by the Department of Finance and Administration were factors hindering her ability to find a job.

At the time of trial in January 2016, Ms. Wallace was drawing weekly net unemployment benefits of $190.00. She had been drawing unemployment benefits since October 2015. She stated that she believed the benefits would discontinue about six weeks from the date of the trial. Ms. Wallace also testified that she believed that if she were to stop working

10

at the present time, she would be eligible to receive social security benefits of approximately $800.00 per month. She testified that she would rather work for the State of Arkansas long enough to become vested in her pension plan and to increase her social security benefits than begin drawing her social security benefits early.

***Monthly Expenses.*** Ms. Wallace testified that except for her regular monthly living expenses, she has no debts other than the student loan debt. When asked about her monthly living expenses, Ms. Wallace gave the following estimates:

| | |
|---|---|
| $50.00 | Automobile Gas |
| $59.02 | Automobile Liability Insurance |
| $64.11 | American Home Shield |
| $100.00 | Church |
| $60.00 | Prescriptions |
| $75.00 | Life Insurance |
| $95.95 | Cellular Phone Service |
| $51.28 | AT&T Internet and Home Phone for Security System |
| $200.00 | Grocery/Beauty and Hygiene/Household Products |
| $31.67 | ADT Security Services ($95.00 every three months) |
| $88.76 | Direct TV |

The above expenses total $875.79 per month.

The automobile gas expense and the automobile liability insurance are necessary for Ms. Wallace to operate her vehicle, which she uses to pay bills, go to church, and look for jobs. Ms. Wallace explained that American Home Shield protects her from having to pay for major plumbing, electrical, or other necessary repairs to her home because the company provides certain repair services for her home when needed. In addition to the monthly cost of $64.11, Ms. Wallace is responsible for a service fee of $75.00 at the time of any repair. As to donations to her church, Ms. Wallace testified that she believes in tithing and believes that tithing is "exactly

what God want [sic] us to do." (Tr. at 23). She buys her prescriptions with a discount card to save money on her medicine. She explained she needs a cellular phone in case of an emergency away from home such as her car breaking down, needing a tow truck, or needing to call a relative. Ms. Wallace explained that the home phone was necessary for her security system. She further explained that the internet service was necessary for her to continue to look for employment opportunities and apply for positions online.

Ms. Wallace also testified that she pays Legal Shield, a service that provides legal services as needed; however, there was no testimony indicating the amount of the expense associated with this service. [6] In addition, although Ms. Wallace testified that she received shutoff notices for her utilities during 2014, there was no testimony regarding monthly utility expenses such as water, electricity, gas, or sewer service.

Ms. Wallace testified that it would be a hardship to her if she had to repay her student loans.

## DISCUSSION

Section 523(a)(8) of the United States Bankruptcy Code provides that "debts for educational loans 'made, insured, or guaranteed by a governmental unit'" may not be discharged unless "'excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents.'" *Educ. Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 778 (8th Cir. 2009) (quoting 11 U.S.C. § 523(a)(8) (2012)). The debtor has the burden of proving, by a preponderance of the evidence, that excepting a student loan debt from discharge would be an undue hardship on the debtor. *Id.* at 779; *Conway v. Nat'l Collegiate Trust (In re Conway)*, 495 B.R. 416, 419 (B.A.P. 8th Cir. 2013), *aff'd per curiam*, 559 Fed. Appx. 610 (8th Cir. 2014).

---

[6] She testified that she met her attorney, Mr. Davis, through Legal Shield and further testified that Mr. Davis is representing her in this proceeding on a *pro bono* basis. The Court acknowledges this service.

"The words provided in [Section 523(a)(8)] are clearly singular. The Code does not refer to a debtor's sum of student loans, aggregate student loan debt, or other accumulated, consecutive, or consolidated loan obligations." *Andresen v. Neb. Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 136 (B.A.P. 8th Cir. 1999), *abrogated on other grounds by Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549 (8th Cir. 2003). Where there are multiple loans, the court must do a separate evaluation for each. *Id.* at 137 (affirming lower court's holding that two loans would be discharged, while one loan would remain nondischargeable; loans were held by same creditor).

In the Eighth Circuit, to determine whether a debtor's repayment of a student loan will result in an undue hardship, the court applies the totality of the circumstances test. *Jesperson,* 571 F.3d at 779. This standard requires an analysis of the debtor's "past, present, and reasonably reliable future financial resources, the debtor's reasonable and necessary living expenses, and 'any other relevant facts and circumstances.'" *Id.* (quoting *In re Long,* 322 F.3d at 554).

In considering "other relevant circumstances," courts within the Eighth Circuit consider the following factors:

> (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.

*Id.* at 783-84 (Smith, J., concurring) (quoting *McLaughlin v. U.S. Funds (In re McLaughlin),* 359 B.R. 746, 750 (Bankr. W.D. Mo. 2007)).

Another factor considered by courts in evaluating the totality of the circumstances is the availability and pursuit of an ICRP.  *Id*. at 784 (citing *Cumberworth v. U.S. Dep't of Educ. (In re Cumberworth),* 347 B.R. 652, 661 (B.A.P. 8th Cir. 2006)).  Courts have rejected a "per se" rule requiring enrollment in an income driven repayment plan to establish a debtor's good faith effort to repay his or her student loans.  *Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett),* 487 F.3d 353, 364 (6th Cir. 2007); *see also Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch),* 409 F.3d 677, 682 (6th Cir. 2005).  As the Sixth Circuit explained:

> Congress recently enacted "the most sweeping reform of bankruptcy law since the enactment of the Bankruptcy Code in 1978." Yet Congress left § 523(a)(8)'s "undue hardship" language intact. Had Congress intended participation in the ICRP-implemented in 1994-to effectively repeal discharge under § 523(a)(8), it could have done so. In addition, requiring enrollment in the ICRP runs counter to the Bankruptcy Code's aim in providing debtors a "fresh start." The debtor is encumbered with the debt for an additional twenty-five years, regardless of the length of the student loans. If, at the end of the twenty-five years, the debtor has been unable to repay all the student loans, the remaining debt is canceled and that discharge of indebtedness is treated as taxable income. The result, as the bankruptcy court noted, would be that [the debtor] would "be trading one nondischargeable debt for another."

*In re Barrett,* 487 F.3d at 364 (citations omitted) (quoting Terrence L. Michael & Janie M. Phelps, *"Judges?! We Don't Need No Stinking Judges!!!": The Discharge of Student Loans in Bankruptcy Cases and the Income Contingent Repayment Plan,* 38 TEX. TECH L. REV. 73 (2005)).

But if a debtor refuses to enroll in an ICRP because he or she wants a "fresh start," indicating that the debtor has a "lack of interest in repaying [his or] her debt," then such factor weighs in favor of *not* discharging the debt.  *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour),* 433 F.3d 393, 403 (4th Cir. 2005).

In analyzing the facts of a particular case in light of the totality of the circumstances test, a bankruptcy court makes the "post-discharge undue hardship determination . . . on the basis of

the facts existing at the time of trial." *In re Conway,* 542 B.R. at 858 (citing *Walker v. Sallie Mae Servicing Corp. (In re Walker),* 427 B.R. 471, 482-84 (B.A.P. 8th Cir. 2010)). "The bankruptcy court must make a decision based on the most reliable evidence before it." *Id.*

### The Debtor's Past, Present, and Reasonably Reliable Future Financial Resources

In applying the totality of the circumstances test, the first factor to be considered is the debtor's past, present, and reasonably reliable future financial resources. *Jesperson*, 571 F.3d at 779 (citing *In re Long*, 322 F.3d at 554). "A court may not engage in speculation when determining net income . . . ." *Id.* at 780 (citing *Rose v. Educ. Credit Mgmt. Corp. (In re Rose),* 324 B.R. 709, 712 (B.A.P. 8th Cir. 2005)). Although Ms. Wallace is currently unemployed and receiving unemployment benefits, the Court is "obligated to consider not just a snapshot of her current situation but her likely future income based upon her education and employment history." *Brown v. Am. Educ. Servs., Inc. (In re Brown),* 378 B.R. 623, 627 (Bankr. W.D. Mo. 2007). "A debtor's attempts to obtain employment is one factor for the court to consider in determining earning capacity." *Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks)*, 406 B.R. 382, 383 (Bankr. D. Minn. 2009).

As to Ms. Wallace's past financial resources, she indicated that the highest annual salary she has earned since 2006 was $25,400.00 when she was employed by the Arkansas Municipal League prior to going back to school in 2010. Due to downsizing, she lost that job in 2008. Ms. Wallace's 2014 federal income tax return indicated that she earned only $10,836.00 in gross income in 2014. Her highest rate of pay in the several months before the bankruptcy petition was filed, when she worked with the Arkansas Department of Health, was $10.5987 per hour, which annualizes to gross income of $22,045.30. Ms. Wallace never worked at this position for

15

a full tax year.  Her average net income at the Arkansas Department of Health was $1,239.30 every four weeks from roughly January through September 2015.

As to her present financial resources, at the time of trial in January 2016 Ms. Wallace was unemployed and receiving net unemployment benefits of $190.00 per week.  She testified that she believed these benefits would expire approximately six weeks from the date of the trial.

As to her reasonably reliable future financial resources, Ms. Wallace testified that she was currently eligible to receive social security benefits of approximately $800.00 per month, or $9,600.00 per year.  Her unemployment benefits will expire and accordingly, cannot be included in her reasonably reliable future financial resources.  In addition, although Ms. Wallace has applied for numerous positions since obtaining her two associate degrees, including twenty-three positions since losing her job in October 2015, she has had dismal results.  While she was called for multiple interviews in response to her past job applications, since October 2015 she was called for only one interview in response to the twenty-three applications submitted, and was not offered that position following the interview.  The Court notes that although Ms. Wallace expressed a desire to obtain a position with the State of Arkansas for purposes of vesting her state pension plan, she also broadened her search and applied for positions with private employers as well.  She believes that various factors, including her age and her termination from the Department of Finance and Administration, have hindered her ability to obtain employment. "The age of the Debtor is a factor the Court may take into consideration in assessing whether repayment of the debt constitutes an undue hardship." *Fahrer v. Sallie Mae Servicing Corp. (In re Fahrer),* 308 B.R. 27, 35 (Bankr. W.D. Mo. 2004) (citing *Ford v. Student Loan Guarantee Found. of Ark. (In re Ford),* 269 B.R. 673, 677 (B.A.P. 8th Cir. 2001)).  The Court also notes

that Ms. Wallace's education has not given her an advantage in her earnings because the highest income she has earned since 2006 was earned *prior to* her completing her associate degrees.

Based on Ms. Wallace's testimony, demeanor, sporadic past employment history, present unemployment, past and present earnings history, the discouraging history of not being offered new employment opportunities, and her apparent dismal employment prospects, the Court finds it more likely than not that Ms. Wallace will be unable to obtain employment in the future. Without additional employment with the State of Arkansas, Ms. Wallace's pension will not vest. No evidence was presented for the Court to find that Ms. Wallace would receive any income after retirement other than her social security benefits. Moreover, even if she were able to find employment, which the Court finds doubtful, given her current age it will only be a short time before she would reach the age of retirement and begin drawing her social security benefits for her income. For the foregoing reasons, the Court does not impute additional income to Ms. Wallace and finds Ms. Wallace's reasonably reliable future financial resources to be her social security benefits, which she has estimated to be $800.00 per month, or $9,600.00 per year.

**The Debtor's Reasonable and Necessary Living Expenses**

The next factor for the Court to consider is Ms. Wallace's reasonable and necessary living expenses. *Jesperson*, 571 F.3d at 779 (citing *In re Long*, 322 F.3d at 554). "A court may not engage in speculation when determining . . . reasonable and necessary living expenses." *Id*. (citing *In re Rose,* 324 B.R. at 712). "To be reasonable and necessary, an expense must be 'modest and commensurate with the debtor's resources.'" *Id*. (quoting *DeBrower v. Pa. Higher Educ. Mgmt. Corp. (In re DeBrower),* 387 B.R. 587, 590 (Bankr. N.D. Iowa 2008)).

Ms. Wallace does not have a house payment or car payment.[7]  The total monthly expenses adduced at trial totaled $875.79 and did not include any estimate for water, electricity, gas, clothes, real estate taxes, homeowner's insurance, personal property taxes, medical expenses (other than prescriptions), or entertainment.  In addition, Ms. Wallace testified that her appliances are all at least ten years old, her car needs repairs she cannot currently afford, and her home's foundation is in need of repair.  Each of these factors indicate probable future expenses, but no estimate of the expense will be included in her monthly expenses since such an estimate would be speculation on the part of the Court.

Ms. Wallace did testify regarding several monthly expenses and the Court finds her testimony credible.  Certainly the expenses as estimated by Ms. Wallace for gasoline, automobile insurance, prescriptions, home security system, groceries, and household products reflect not only reasonable and necessary living expenses, but meager expenses.

Ms. Wallace also explained her need for the American Home Shield expense and the Court finds her testimony credible that this service provides needed protections for her against major plumbing or electrical expenses.

Further, the Court does not find Ms. Wallace's expenditures for life insurance, cellular phone, internet, or a home telephone to be unreasonable.  She explained that the cellular phone is needed in case she is away from home and has an emergency, the home telephone line is necessary for her home security system, and that she uses the internet for searching and applying for employment opportunities.

Ms. Wallace's habit of tithing was based on her belief that tithing is a requirement of her religion.  Courts have held that charitable donations can be included in a debtor's reasonable and

---

[7] Ms. Wallace testified that she paid off her mortgage on her home in July 2015.  No evidence was introduced as to the amount of the monthly payment.

necessary living expenses depending on the facts in the case. *Cline v. Ill. Student Loan Assistance Ass'n (In re Cline)*, 248 B.R. 347, 351 (B.A.P. 8th Cir. 2000). Based on Ms. Wallace's testimony, the Court does not find her tithe to be an unreasonable expense.

Counsel for the USDE argued at closing that the Direct TV expense was unreasonable; however, given Ms. Wallace's testimony that she does not eat out, go to movies, take vacations, or participate in any other type of entertainment, the Court cannot find that the Direct TV expense of $88.76 per month is unreasonable under the circumstances of this case.

Based on the foregoing, the Court finds that Ms. Wallace's monthly expenses as reflected by the evidence of $875.79 are reasonable and necessary living expenses.

## Other Relevant Facts and Circumstances

### *Total Present and Future Incapacity to Pay Debts for Reasons Not Within the Control of the Debtor*

The Court will next consider Ms. Wallace's present and future incapacity to pay her student loans and whether that incapacity is within her control. At the present time, Ms. Wallace's total estimated monthly expenses exceed the amount she is receiving in unemployment benefits. At the time of trial, Ms. Wallace had been receiving unemployment benefits for nearly four months. If she continues to be unable to find employment, she testified her unemployment benefits would expire and her only alternative would be to begin drawing social security benefits. Based on her testimony, Ms. Wallace would still have insufficient monthly income to meet her monthly expenses while drawing her social security benefits of approximately $800.00 per month.

The Court has already found that Ms. Wallace's reasonably reliable future financial resources are insufficient to pay her meager reasonable and necessary living expenses. The analysis above regarding Ms. Wallace's past, present, and reasonably reliable future financial

resources discussed the numerous factors the Court considered in making that determination. These factors included past and present employment history, past and present earnings history, the discouraging history of not being offered new employment opportunities, and Ms. Wallace's dismal employment prospects.  None of the factors are in the control of Ms. Wallace.

Based on the most reliable evidence before the Court, the Court believes that even if Ms. Wallace were to obtain employment, which again the Court finds unlikely, given her current age and number of years until she would stop working, she will likely be limited in income to her social security benefits in the not too distant future.  This finding is based not only on Ms. Wallace's current age, but on the length of time she has been employed in previous positions.

The Court finds Ms. Wallace's reasonable and necessary monthly expenses to be at least $875.79 based on the testimony presented.  From the evidence the Court also finds Ms. Wallace's testimony credible that both her home and car are in need of repairs, she currently does not have health insurance, and is currently foregoing her doctor appointments because she is not insured and lacks funds to pay for the visits.  In addition, as noted above, the Court also believes the $875.79 in monthly expenses does not include all of the Debtor's monthly expenses; however, the Court will not speculate as to the amount of these additional expenses, such as expenses for utilities.  For all the foregoing reasons, the Court finds that Ms. Wallace's present and future incapacity to pay her student loan debts are not within the control of Ms. Wallace. This factor weighs in favor of discharging her student loan debt.

*Whether Ms. Wallace has Made a Good Faith Effort to Negotiate a Deferment or Forbearance of Payment*

The next factor for the Court to consider is whether Ms. Wallace has made a good faith effort to negotiate a deferment or forbearance of the payments on the student loans.  Ms. Wallace testified that she did in fact request a forbearance from paying the twelve loans disbursed under

20

the 2010 Master Promissory Note, which request was granted.  Ms. Wallace, therefore, not only made a good faith effort, but succeeded in her efforts to negotiate a forbearance from payment. This factor weighs in favor of discharging her student loan debt.

### Whether the Hardship is Long-Term

Another factor the Court is to consider is whether the hardship will be long-term.  The Court finds that because of the nature of Ms. Wallace's circumstances, including the number of years left for Ms. Wallace to be employed; her past employment history; and her lack of success in obtaining new employment, her incapacity to pay the student loans is, in fact, a long-term hardship.  This factor weighs in favor of discharging her student loan debt.

### Whether Ms. Wallace has Made Payments on the Student Loans

The evidence revealed that Ms. Wallace did make payments on the 2005 Promissory Note under the ICRP and reduced the principal from $3,598.38 to $1,579.08 by making payments of $50.00 per month.  Ms. Wallace did not make any payments on the loans disbursed under the 2010 Master Promissory Note, but instead requested and was granted a forbearance because of her inability to make payments on the loans, as discussed above.  This factor weighs in favor of discharging her student loan debt.

### Whether Ms. Wallace has a Permanent or Long-Term Disability

As to whether Ms. Wallace has a permanent or long-term disability, the testimony revealed that Ms. Wallace is a cancer survivor, is taking prescribed medication because of her cancer diagnosis, and was still under a doctor's care for her cancer illness at the time of trial. Ms. Wallace demonstrated both determination and hope when testifying that her cancer illness did not stand in the way of her being able to obtain employment.  No other evidence of any type of disability was introduced.  The evidence does not support a finding that Ms. Wallace has a

21

permanent or long-term disability.  This factor weighs in favor of not discharging Ms. Wallace's student loan debt.

### *The Ability of Ms. Wallace to Obtain Gainful Employment in the Area of Study*

Ms. Wallace described her two associate degrees as being under a "business umbrella." (Tr. at 30).  One associate degree was in accounting and the other in office technology.  Both were earned at a local technical college.  She earned the first associate degree in 2012 and started working as an Access Coordinator for the University of Arkansas for Medical Sciences in October 2012.  She earned her second associate degree in 2014 and started working at the Arkansas Department of Health in June 2014, as an Administrative Specialist 2, which she described as a data entry position.  The evidence is not clear as to the job qualifications for these two positions or whether Ms. Wallace's associate degrees were either required or advantageous to her obtaining the positions, although the two positions, based on their titles and Ms. Wallace's description, do appear to fit within a general business category.

The Court, however, questions whether either associate degree actually afforded new opportunities to Ms. Wallace.  Ms. Wallace's highest salary in the past ten years was the salary she earned between 2006 and 2008 *prior to* her completion of the two associate degrees.  Although Ms. Wallace has enjoyed sporadic employment since obtaining her associate degrees, the evidence revealed that she has not been able to maintain this employment, or obtain new employment despite her numerous attempts.  The Court finds, therefore, that this factor weighs in favor of discharging Ms. Wallace's student loan debt.

### *Whether Ms. Wallace has Made a Good Faith Effort to Maximize Income and Minimize Expenses*

The evidence revealed that Ms. Wallace has made a good faith effort to obtain employment and maximize her income.  Ms. Wallace's notebook revealed that she applied for

dozens of jobs each year she was attending school to obtain her associate degrees. These applications were for positions with job titles that appear to fit under a "business umbrella," and also for positions outside her area of study. In addition, although some of the positions Ms. Wallace applied for were with employers other than the State of Arkansas, a substantial number of the positions were with the State of Arkansas. This supports a finding that Ms. Wallace was seeking to maximize her future income by obtaining a position with the State of Arkansas in order to become vested in her pension.

The evidence also reveals Ms. Wallace's good faith effort to minimize her expenses. As discussed above, Ms. Wallace's expenses are meager and reflect an extremely frugal lifestyle. Accordingly, the Court finds this factor weighs in favor of discharging Ms. Wallace's student loan debt.

### Whether the Dominant Purpose of the Bankruptcy Petition was to Discharge the Student Loan and the Ratio of Student Loan Debt to Total Indebtedness

No evidence was presented for the Court to determine whether the dominant purpose of filing bankruptcy was to discharge the student loan debt. The bankruptcy schedules were not introduced and no testimony was presented for the Court to determine the ratio of student loan debt to Ms. Wallace's total indebtedness at the time the bankruptcy petition was filed. Ms. Wallace admitted that the student loan debt was her largest debt. When estimating monthly living expenses, Ms. Wallace testified that she has no debts other than her regular monthly expenses. This testimony can be viewed two ways. Ms. Wallace may not have had other debts before bankruptcy or she did not have other debts to pay along with her monthly living expenses because of the bankruptcy discharge. Because there was insufficient evidence on this factor and the Debtor bears the burden of proof, the Court finds this factor weighs in favor of not discharging Ms. Wallace's student loan debt.

23

*Availability and Pursuit of ICRP*

In addition to the other factors discussed, "[t]he Court must consider the consequences of Debtor's potential participation in the ICRP and the efficacy of that relief under the circumstances." *In re Fahrer,* 308 B.R. at 35. The USDE argued that despite the fact that Ms. Wallace is currently unemployed, the Department of Education offers both income based and income contingent repayment plans and under Ms. Wallace's "circumstances right now, her payment would be zero [a]nd after 25 years, if the debt was not repaid, the debt would be forgiven." [8] (Tr. at 7).

Under the income based repayment plan, if a borrower has a "partial financial hardship," the monthly loan payments are "limited to no more than 15 percent . . . of the amount by which the borrower's AGI exceeds 150 percent of the poverty guideline applicable to the borrower's family size, divided by 12." 34 C.F.R. § 685.221(b)(1) (2016). After twenty-five years, the balance of the loan may be forgiven under certain circumstances. *See* 34 C.F.R. § 685.221(f) (2016). Under the ICRP, a borrower's annual student loan payment will be "the lesser of (A) [t]he amount the borrower would repay annually over 12 years using standard amortization multiplied by an income percentage factor that corresponds to the borrower's AGI . . . or (B) 20 percent of discretionary income." 34 C.F.R. § 685.209(b)(1)(ii) (2016). If the loan is not repaid in full in twenty-five years, the outstanding balance and accrued interest is cancelled. 34 C.F.R. § 685.209(b)(3)(iii)(D) (2016).

---

[8] When making this argument, it was unclear to the Court whether counsel for the USDE was referring to the income based repayment plan, the ICRP, or both, as both are based on the borrower's income and after twenty-five years any remaining debt may be forgiven under either plan. (Def.'s Ex. 10 at 6, 7); 34 C.F.R. §§ 685.209, 685.221 (2016).

24

Importantly, however, amounts forgiven under either the income based or income contingent repayment plans "may be considered income by the Internal Revenue Service and subject to federal income tax."  (Def.'s Ex. 10 at 6, 7); *see also* 34 C.F.R. §§ 685.209(b)(3)(iii)(D)(3), 685.221(f)(5)(i)(C) (2016).  In addition, accruing and unpaid interest may be capitalized under both repayment plans as well.  (Def.'s Ex. 10 at 6, 7); 34 C.F.R. §§ 685.209(b), 685.221(b) (2016).

Ms. Wallace participated in the ICRP in repaying a significant portion of the 2005 Promissory Note.  Her testimony was that she paid $50.00 per month under the ICRP.  Under this repayment plan she was able to reduce the principal from $3,598.38 to $1,579.08 as of September 3, 2015.  This $50.00 monthly expense was not included in her monthly expenses.

Ms. Wallace admitted that she did not request to participate in the income based repayment plan or ICRP for the twelve loans disbursed under the 2010 Master Promissory Note, but explained that she did not do so because she could not afford to make any payments on the loans at the time.  Instead, she requested and received a forbearance or an extension of time to start making the payments on those loans.  Her willingness to participate in the ICRP program when she had the ability to do so in connection with the 2005 student loan is persuasive evidence to the Court that Ms. Wallace would have asked to participate in the ICRP in 2014 if she could have afforded to make payments.  The Court is mindful that in 2014, at the time she requested the forbearance, Ms. Wallace was receiving shut-off notices for delinquent utility bills.  The Court does not find Ms. Wallace's failure to pursue the ICRP to be a lack of interest in repaying the debt.  Instead, the evidence leads to a finding that she asked for the forbearance because she knew she was unable to pay any amount on the student loan debt.

As of September 3, 2015, Ms. Wallace's student loan balances totaled $45,203.62. Under either the income based repayment plan or ICRP, interest will continue to accrue. In twenty-five years the balances will be significantly higher because of the accruing of interest.

Moreover, in twenty-five years Ms. Wallace will be eighty-eight years old. "The age of the Debtor is a factor the Court may take into consideration in assessing whether repayment of the debt constitutes an undue hardship." *In re Fahrer,* 308 B.R. at 35 (citing *Ford v. Student Loan Guarantee Found. of Ark. (In re Ford),* 269 B.R. 673, 677 (B.A.P. 8th Cir. 2001)). As stated by the Court in *In re Fahrer,* "requiring a debtor to participate in an extended repayment plan which significantly exceeds the debtor's working life constitutes an undue hardship." *Id.* (citing *Brown v. Union Fin. Servs., Inc. (In re Brown),* 249 B.R. 525, 527-28 (Bankr. W.D. Mo. 2000) ("The age of a debtor becomes a relevant circumstance to be considered by the court in making an undue hardship determination when the student loan lender proposes a 20 year repayment schedule in order to demonstrate that a debtor can repay the student loan obligation. Requiring someone to repay a student loan under a repayment schedule that far exceeds one's average working life imposes an undue hardship on the debtor.")).

When Ms. Wallace is eighty-eight years old, her house will be twenty-five years older and her vehicle will likely be replaced or no longer needed. The Court cannot speculate as to whether Ms. Wallace will be insolvent at that time; however, based on the earlier findings of Ms. Wallace's reasonably reliable future financial resources, the Court can find that if Ms. Wallace does incur a tax liability as a result of the forgiveness of debt, based on the facts before the Court she will not have the financial resources to pay the tax debt.

Based on all of these factors, the Court holds that to require Ms. Wallace, at the age of sixty-three, to participate in the ICRP program for twenty-five years only to then face potential

tax liability at age eighty-eight, would be an undue hardship.  This factor weighs in favor of discharging the student loan debt.

**Separate Evaluations of Multiple Loans**

In the Eighth Circuit, where there are multiple student loans, the bankruptcy court must complete a separate evaluation for each loan.  *In re Andresen*, 232 B.R. at 136-37.  In this case, one disbursement was made under the 2005 Promissory Note and twelve disbursements were made under the 2010 Master Promissory Note.  The USDE's exhibits introduced at trial refer to the twelve disbursements as "loans," each with their own principal amount and interest rate. (*See e.g.,* Def.'s Ex. 1 at 1, Def's Ex. 2).

Under the circumstances of this case, however, it matters not whether there was one loan or thirteen loans.  Evaluating each loan separately results in the same determination: paying any one of the loans will constitute an undue hardship on the Debtor.  At the time of trial, Ms. Wallace was receiving unemployment benefits in an amount insufficient to pay her reasonable and necessary living expenses.  Ms. Wallace's reasonably reliable future financial resources in the form of social security benefits will also be insufficient to pay her reasonable and necessary living expenses.  In addition, Ms. Wallace testified regarding expenses she will incur in the future for necessary home and car repairs.

Adding any payment for the student loan, no matter how small, to Ms. Wallace's monthly expenses would be futile.  Her income is and will more likely than not continue to be insufficient to pay any amount.  Ms. Wallace cannot be forced into a repayment plan when an undue hardship exists.  As stated above, even if the income based repayment plan or ICRP were applied to the student loans and resulted in no monthly payment, after twenty-five years the debt forgiveness may create a tax liability for Ms. Wallace, swapping the student loan debt for a tax

debt.  Based on the foregoing discussion, the Court finds that separate evaluations for each loan leads to the same result for each: the repayment would result in an undue hardship.

## CONCLUSION

The factors discussed above present a difficult decision; however, for all the foregoing reasons and based on the weight of the evidence and the weight of the various factors as discussed above, the Court finds that Ms. Wallace has met her burden of proving that under the totality of the circumstances of this case the debt she owes to the USDE is an undue hardship on her and the student loan debt she owes to the USDE should be discharged in its entirety.  A separate judgment consistent with this memorandum opinion will be entered in favor of Ms. Wallace.

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  09/15/2016

cc:     Mr. Steven R. Davis
        Ms. Stacey E. McCord
        Mr. Richard L. Cox
        U.S. Trustee
        Debtor